**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2249-24

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

KAYVON BLOUNT,

    Defendant-Appellant.

_____

Submitted May 12, 2026 – Decided July 24, 2026

Before Judges Susswein and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 22-10-1307.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Rachel A. Neckes, Assistant Deputy Public Defender, of counsel and on the briefs).

Wayne Mello, Hudson County Prosecutor, attorney for respondent (Colleen Kristan Signorelli, Assistant Prosecutor, on the brief).

PER CURIAM

Defendant Kayvon Blount appeals his guilty plea conviction for unlawful possession of a firearm, N.J.S.A. 2C:39-5(b)(1). Specifically, defendant appeals the June 25, 2024 Law Division order denying his motion to suppress the handgun that officers recovered in his fanny pack—which defendant discarded during a foot chase. The critical issue is whether the officers had reasonable suspicion to believe defendant was committing an offense when they began to pursue him, transforming a consensual field inquiry into an investigative detention. After reviewing the record in light of the governing legal principles, we affirm. Considering the totality of the circumstances, we hold there was reasonable and articulable suspicion for the detectives to pursue defendant when he fled from them as they approached to conduct a field inquiry.

I.

We discern the following pertinent facts and procedural history from the record. At around 7:00 p.m. on May 23, 2022, Jersey City Police Department (JCPD) Detectives Sanchez and Colon were at the police station monitoring a CCTV live feed of the area around Van Horne Street and Bramhall Avenue. While watching the feed, Sanchez recognized some of the men assembled near the intersection from prior arrests and interactions he had with them. He believed that some of them were "high ranking gang members." Sanchez also

testified that police had noted a recent spike in gang-related violence in the area, including a shooting on February 10, 2022 that occurred one block away. Sanchez also testified that, in his experience, lower-ranking gang members are likely to be carrying firearms for the higher-ranking members' protection.

Defendant was among the group Sanchez was watching via the CCTV feed. Defendant was wearing an orange T-shirt, grey shorts, and a black fanny pack or crossover body bag with white stitching on the strap. Sanchez recognized defendant from an Instagram post in which defendant appears to have a handgun in his waistband. While the image was posted on March 21, 2022 (nine weeks earlier), Sanchez testified that he believed he had viewed it that day while watching the live feed. He also believed the Instagram image was taken in one of the vacant homes being developed in the area. At that time, Sanchez did not know defendant's name, although he was familiar with defendant's Instagram account and recognized his username. Sanchez testified that he monitors publicly viewable Instagram accounts on a daily basis, and acknowledged that prior to defendant's arrest, he did not make any note of defendant's post or account and did not take any steps to preserve the posted image.

A-2249-24

Sanchez testified that defendant's fanny pack appeared to be "heavy" and "slightly weighted down on one side of his hip." He also observed that while defendant periodically rested his hands on the fanny pack, he never opened it and kept his phone in his pocket.

At one point, Sanchez observed defendant appear to take off the fanny pack and adjust it. Sanchez also observed defendant look over his right shoulder while "manipulating" the fanny pack. Sanchez testified as to his training and experience, noting that he has made dozens of arrests where firearms were found in fanny packs.

Sanchez and Colon decided to continue their investigation by going to the area, while continuing to monitor the CCTV feed from the computer in their patrol car. The detectives drove by the intersection seeking to "make [their] presence known" and to "expose" themselves to the group to indicate that "police are present." Their car was unmarked but was equipped with lights and sirens, and they wore plain clothes with visible badges.

While driving by, Sanchez made eye contact with the individuals on scene, and later testified that the individuals appeared to recognize him, stating "that's Sanchez" or something to that effect.

4

Sanchez parked a block or two away and monitored the group's reaction to the police drive-by on the CCTV feed. Sanchez testified that he observed defendant "getting nervous," "looking all around," and trying to "conceal himself." Defendant then "flagg[ed] down" a black Hyundai and entered the car. Defendant exited it about five minutes later, with the fanny pack now in his hand rather than on his body. Sanchez testified that, at that point, based on his experience, prior information, and observations, he determined "there was a strong possibility [defendant] could be in possession of a firearm in th[e] fanny pack," and he notified the Street Crimes Unit stationed nearby of that suspicion.

Sanchez drove back to the intersection of Van Horne and Bramhall, exited the police car, and approached defendant and the other members of the group, saying, "What's up, fellas." Sanchez testified that his goal was only to speak with defendant at that time. As Sanchez approached, defendant began running. Sanchez and other officers pursued defendant through several backyards. After about forty-five seconds, officers apprehended defendant in the backyard of a home on Van Horne Street. When officers began chasing defendant, the fanny pack was on his body, but when they apprehended him, it was missing. Officers located the fanny pack in an alleyway near the backyard and found a firearm inside.

A-2249-24

On October 20, 2022, defendant was charged by indictment with unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1) (count one); possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count two); and obstruction, N.J.S.A. 2C:29-1(a) (count three).

On January 28, 2023, defendant moved to suppress the physical evidence seized following his arrest, including the firearm and fanny pack. A suppression hearing was held on November 3, 2023 and February 2, 2024. The State presented testimony from Sanchez and introduced the CCTV footage that Sanchez was monitoring that evening as well as body-worn camera video from both Sanchez and Colon.

On June 15, 2024, the motion court denied the suppression motion on the record, and on June 25, issued a nine-page written opinion and order. The court began its opinion with its findings of fact, starting with Sanchez's observations of the CCTV footage. The motion court found that Sanchez observed defendant "standing among known gang members that [Sanchez] recognized from prior encounters." The court found that Sanchez "recognized [d]efendant from an Instagram post" that "showed [defendant] with a handgun in his waistband and was approximately nine weeks old" at the time. The court further found that Sanchez "observed [that defendant's] fanny pack appeared heavy and weighted,"

6

and that defendant "did not access the fanny pack and instead used his pockets for storing items such as his phone." The court noted that in his police report, Sanchez wrote that defendant was "manipulating" the fanny pack while "nervously" looking over his shoulder.

The court found that after the detectives drove by the group, Sanchez "observed [defendant] 'getting nervous' by 'looking all around,'" and also found that defendant flagged down a car, got in the back seat, and then exited the car with the fanny pack in his hand rather than on his body. The court also found that when Sanchez approached defendant, he fled, and during the chase discarded the fanny pack in a residential alleyway.

Turning to the legal analysis, the motion court determined that Sanchez's initial approach constituted a lawful field inquiry, and that Sanchez's subsequent pursuit of defendant was a permissible seizure supported by "reasonable cause and probable cause." Specifically, the court found that Sanchez's observation of defendant's "nervous behavior, affiliation with known gang members, and recent social media post depicting him with a firearm" provided a sufficient basis for the seizure.

On August 20, 2024, defendant pled guilty to second-degree unlawful possession of a firearm pursuant to a negotiated plea agreement that included a

A-2249-24

recommended sentence of five years in prison with one-year of parole ineligibility, pursuant to a Graves Act waiver. See N.J.S.A. 2C:43-6.2. The State also agreed to dismiss the remaining counts. On February 28, 2025, the court deviated from the sentence recommended in the plea agreement and sentenced defendant to three years of non-custodial probation after determining that a Graves Act waiver/reduction of the mandatory forty-two-month parole ineligibility term was appropriate.[1]

This appeal followed. Defendant raises the following contentions for our consideration:

> POINT I
>
> THE STOP WAS UNCONSTITUTIONAL BECAUSE THE TOTALITY OF THE CIRCUMSTANCES— INCLUDING A STALE SOCIAL MEDIA POST, MERE ASSOCIATION WITH OTHERS, AND AN UNSUBSTANTIATED CLAIM OF NERVOUSNESS—DID NOT AMOUNT TO REASONABLE SUSPICION.

Defendant raises the following additional arguments in his reply brief:

> POINT I
>
> BECAUSE NO FACTOR CITED BY THE HEARING COURT OR STATE INDIVIDUALLY OR CUMULATIVELY AMOUNT TO A REASONABLE SUSPICION, THE POLICE STOP WAS UNCONSTITUTIONAL.

---

[1] The State does not appeal from the reduced sentence.

## II.

We begin our analysis by acknowledging the legal principles governing this appeal. As a general matter, "[o]ur standard of review on a motion to suppress is deferential." State v. Nyema, 249 N.J. 509, 526 (2022). "Appellate courts reviewing a grant or denial of a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Lamb, 218 N.J. 300, 313 (2014) (citing State v. Elders, 192 N.J. 224, 243 (2007)). Deference is accorded to those factual findings because they "are substantially influenced by [an] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Elders, 192 N.J. at 244 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). "Thus, appellate courts should reverse only when the trial court's determination is 'so clearly mistaken that the interests of justice demand intervention and correction.'" Lamb, 218 N.J. at 313 (quoting Elders, 192 N.J. at 244). Relevant here, this deferential standard of review extends to factual findings based on a video recording. State v. S.S., 229 N.J. 360, 379-81 (2017). "A trial court's interpretation of the law, however, and the [legal] consequences that flow from established facts are not entitled to any special deference." Lamb, 218 N.J. at 313 (citing State v. K.W.,

214 N.J. 499, 507 (2013)). "Therefore, a trial court's legal conclusions are reviewed de novo." Ibid. (citing State v. Gandhi, 201 N.J. 161, 176 (2010)).

Turning to substantive principles, "[t]he Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, in almost identical language, protect against unreasonable searches and seizures." State v. Smart, 253 N.J. 156, 164-65 (2023) (quoting Nyema, 249 N.J. at 527). One of the bedrock principles under both Constitutions is that warrantless searches and seizures are presumptively invalid. See State v. Goldsmith, 251 N.J. 384, 398 (2022); State v. Pineiro, 181 N.J. 13, 19 (2004). "To justify a warrantless search or seizure, 'the State bears the burden of proving by a preponderance of the evidence that [the] warrantless search or seizure falls within one of the few well-delineated exceptions to the warrant requirement.'" State v. Vanderee, 476 N.J. Super. 214, 230 (App. Div. 2023) (alteration in original) (quoting State v. Chisum, 236 N.J. 530, 546 (2019)), certif. denied, 255 N.J. 506 (2023).

One such exception is an investigative detention or investigatory stop, which "occurs during a police encounter when 'an objectively reasonable person' would feel 'that [their] right to move has been restricted.'" Chisum, 236 N.J. at 545 (quoting State v. Rosario, 229 N.J. 263, 272 (2017)); see also State v.

10

Tucker, 136 N.J. 158, 166 (1994) (holding that a person is constitutionally seized when pursued by the police after fleeing on foot). An investigatory stop may be made without a warrant, or probable cause, "'if it is based on "specific and articulable facts which, taken together with rational inferences from those facts," give rise to a reasonable suspicion of criminal activity.'" Nyema, 249 N.J. at 527 (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968))).

In determining whether an investigative detention is justified under the reasonable suspicion standard, "a court must consider 'the totality of the circumstances—the whole picture.'" State v. Stovall, 170 N.J. 346, 361 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). Furthermore, reasonable suspicion "requires 'some minimal level of objective justification for making the stop.'" State v. Amelio, 197 N.J. 207, 211-12 (2008) (quoting State v. Nishina, 175 N.J. 502, 511 (2003)); see also State v. Scriven, 226 N.J. 20, 34 (2016) ("[R]aw, inchoate suspicion grounded in speculation cannot be the basis for a valid stop."). "Although a mere hunch does not create reasonable suspicion, the level of suspicion required is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is

A-2249-24

necessary for probable cause." State v. Gamble, 218 N.J. 412, 428 (2014) (internal quotation marks and citations omitted).

Additionally, reasonable suspicion analysis takes into account "the officers' background and training, and permits them 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" State v. Nelson, 237 N.J. 540, 555 (2019) (additional internal quotation marks omitted) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)); see also Stovall, 170 N.J. at 363 ("It is fundamental to a totality of the circumstances analysis of whether reasonable suspicion exists that courts may consider the experience and knowledge of law enforcement officers.").

## III.

We next apply these principles to the present facts as found by the motion court. We begin by noting that defendant concedes that the officer's initial approach was a lawful field inquiry.[2] The issue before us is whether at the

---

[2] See Nishina, 175 N.J. at 510 (noting that a field inquiry "is a limited form of police investigation that, except for impermissible reasons such as race, may be conducted 'without grounds for suspicion'" (quoting Rodriguez, 172 N.J. at 126)).

A-2249-24

moment police began to pursue defendant as he fled—police conduct constituting a Fourth Amendment seizure—they were aware of facts and reasonable inferences providing reasonable and articulable suspicion to believe that defendant was engaged in unlawful activity.

We conclude that Detective Sanchez's observations—while perhaps each insufficient on their own[3]—collectively gave him reasonable and articulable suspicion that defendant was carrying a firearm inside the fanny pack. Specifically, the reasonable and articulable suspicion threshold was established by: (1) Sanchez's substantial experience with gang activity and shootings in the area, (2) his informed belief that the group defendant was with included several high-ranking gang members, (3) his recognition of defendant from an Instagram post in which defendant appears to possess a gun, (4) his prior experience with individuals carrying firearms in fanny packs, (5) his observation that defendant's fanny pack appeared heavy and weighted down, (6) defendant's adjustments of

---

[3] See Nelson, 237 N.J. at 554-55 ("In determining whether reasonable suspicion exists, a court must consider the totality of the circumstances—the whole picture. To appropriately view the whole picture, the [c]ourt must not engage in a divide-and-conquer analysis by looking at each fact in isolation." (internal quotation marks and citations omitted)); Stovall, 170 N.J. at 368 (holding that "a group of innocent circumstances in the aggregate can support a finding of reasonable suspicion").

the fanny pack and exit from the black Hyundai with it in his hand, (7) defendant's apparent nervousness after the police drive-by, and (8) defendant's flight when police approached to conduct a field inquiry.

With respect to defendant's flight, we acknowledge that "flight alone does not create reasonable suspicion for a stop." State v. Dangerfield, 171 N.J. 446, 457 (2002) (citing Tucker, 136 N.J. at 169). However, "in combination with other circumstances it may support reasonable and articulable suspicion." Pineiro, 181 N.J. at 26. The present situation is readily distinguishable from the facts in Tucker, where the sole reason police pursued the defendant was because he ran when the police vehicle turned the corner and approached a group of individuals, including the defendant. 136 N.J. at 161-62; see also id. at 168-69 (noting "under circumstances demonstrating particularized suspicion . . . such as a high-crime location or late-evening to early-morning hours, police would have greater latitude to subject a citizen to an investigatory stop. The difficulty with this case is that the sole basis asserted for police action was the [defendant]'s flight." (emphasis added)). Here, in stark contrast, the State presented a number of relevant circumstances amounting to reasonable suspicion to justify the foot pursuit. Cf. Pineiro, 181 N.J. at 26 (noting the

14

defendant's flight "add[ed] 'weight to the already existing, reasonable articulable suspicion.'" (quoting State v. Citarella, 154 N.J. 272, 281 (1998))).

Because the foot pursuit was lawful, the fanny pack and firearm that defendant abandoned during the chase was lawfully seized.  See State v. Gartrell, 256 N.J. 241, 250 (2024) ("When property is abandoned . . . the defendant has 'no right to challenge the search or seizure of that property.'" (quoting State v. Johnson, 193 N.J. 528, 548 (2008))).  Cf. Tucker, 136 N.J. at 172 (holding that an object is not "abandoned" if it is discarded in response to an illegal pursuit).

To the extent we have not specifically addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2249-24